**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Norfolk Division**

**DANIELLE MOORE,**
**KRISTIE PHELPS,**
**IN DEFENSE OF ANIMALS,**
**AMERICAN ENVIRONMENT FOUNDATION,**
**and**
**ANIMAL WELFARE INSTITUTE,**

        **Plaintiffs,**

        **v.**              **Civil No: 2:06cv659**

**KIRK KEMPTHORNE,**
        **Secretary, Department of the Interior,**
**and**
**H. DALE HALL,**
        **Director, U.S. Fish and Wildlife Service,**

        **Defendants.**

## OPINION & ORDER

Plaintiffs Danielle Moore, Kristie Phelps, In Defense of Animals, the American

Environment Foundation, and the Animal Welfare Institute ("Plaintiffs"), seek a temporary

restraining order ("TRO") to prevent Defendants, the Department of the Interior and the U.S.

Fish and Wildlife Service ("Defendants"), from conducting a limited black bear hunt in the Great

Dismal Swamp National Wildlife Refuge ("GDSNWR") on December 1 and 2, 2006.  Docs. 1,

3.  This Court heard argument on this matter on the afternoon of November 30, 2006, and ruled

from the bench.

In light of the Complaint (Doc. 1), Motion for Preliminary Injunction and Temporary

Restraining Order (Doc. 2), and Memorandum in Support (Doc.3) submitted by Plaintiffs, as well

as argument at the hearing and evidence admitted by this Court, the Court **FOUND** that Plaintiffs

are not entitled to a TRO against Defendants because Plaintiffs failed to show that they would

suffer irreparable harm should the hunt go forward as planned, nor did they demonstrate a

probability of ultimately prevailing on the merits.  Accordingly, the Court **DENIED** Plaintiffs'

Motion for a Temporary Restraining Order.[1]

## I. FACTUAL BACKGROUND AND PROCEDURAL HISTORY[2]

In 1974, the GDSNWR was established within the limits of the cities of Chesapeake and

Suffolk, Virginia.  Doc. 1 ¶¶ 37, 38.  The GDSNWR is the largest National Wildlife Refuge

located in Virginia, comprising 111,203 acres of federally-protected land designated for

preservation and compatible recreation. See id.; Doc. 3, Ex. 2 at Guiding Principles of the

National Wildlife Refuge System (unnumbered p. 7).  The GDSNWR provides a habitat for most

of the black bears remaining in eastern Virginia, with a population estimated to range between

250 and 350 in number.  Doc. 1 ¶ 40.  Studies conducted in 1988 and 2005 found that the bear

population in the GDSNWR has remained stable over the past 20 years.  Id. ¶ 41.

The United States Fish and Wildlife Service ("FWS") "is the principal federal agency

responsible for conserving, protecting, and enhancing fish and wildlife, plants and their habitats

---

[1]Defendants did not raise the issue of standing; however, it appears from the affidavits of the two individual plaintiffs that they have standing to challenge the hunt.  See Doc. 1, Ex. 1 ¶ 3; Ex. 2 ¶ 3.  At this stage of the proceeding the Court need not consider the standing of the three organizations joined as co-plaintiffs.

[2]The background and history set forth below are derived from evidence tendered in the TRO hearing, as well as pleadings and motions filed with this Court.  These are preliminary factual findings based on the existing record which shall be used for the purpose of this motion only.

for the continuing benefit of the American People." Doc. 3, Ex. 2 at Unnumbered p. 2. Among

its myriad responsibilities, the FWS is charged with management of the 96-million acre National

Wildlife Refuge System. Id. The FWS has designated hunting as a compatible wildlife-

dependent recreational use of the refuge system and has listed it as a component of the National

Wildlife Refuge System's mission. See Doc. 3, Ex. 2 at Guiding Principles of the National

Wildlife Refuge System; National Wildlife Refuge System Improvement Act, Pub. L. No. 105-57,

111 Stat. 1252 (1997). Nevertheless, before it may conduct any category of activity with a

designated National Wildlife Refuge, the FWS must first present an "opening package" through the

Administrative Procedure Act's ("APA") rulemaking process and notice requirements. See 5

U.S.C. § 553(b)(3)(A); 605 FW 2.9 (2006 version of applicable FWS regulation; applicable 1998

version not in record). In 1979, an opening package was published in the Federal Register that

would allow hunting of big game, and specifically deer, in the GDSNWR. Black bear and white-

tailed deer are the only big game in the Commonwealth of Virginia.

In July 1998, the FWS published in the Federal Register proposed changes to its

regulations." Id. ¶ 42. With specific regard to the GDSNWR, the proposed rule reiterated that it

would be open to "Big Game Hunting" and did not purport to make changes to that classification

in the published "proposed rule." The proposed rule instead noted two changes to hunting

conduct in the GDSNWR; namely, the amendments would prohibit shooting across roads and

possession of alcoholic beverages. Id. The FWS received public comments during the month of

August 1998, including a letter from the Fund for Animals, Inc., requesting "documents

pertaining to the decision to permit bear hunting within the Great Dismal Swamp National

Wildlife Refuge (GDSNWR)." Hearing Ex. 3. On September 3, 1998, the FWS published the

final rule, which stated—following the designation for Big Game Hunting—that "Hunters may hunt deer and bear on designated areas of the refuge subject to the following conditions. . . ."[3] Id. ¶ 43.

In 2001, the FWS began a new study for wildlife management in the GDSNWR, including the impact of conducting a bear hunt within the GDSNWR.  In developing the Comprehensive Conservation Plan and Environmental Assessment ("CCP/EA" or "the Plan"),[4] the FWS went through an extensive public scoping process, which included multiple opportunities to engage the public in crafting the CCP/EA.  This process included four (4)

---

[3]Plaintiffs argued that the rule promulgated prior to 1998 mentioned deer only following the designation for "Big Game Hunting," and that "and bear" was added to the final rule in 1998. Plaintiffs, however, did not introduce this prior rule in its filings with this Court or at the hearing. The only rule submitted to this Court is the 1998 rule in its "proposed" and "final" forms.  These versions do not make a distinction between deer and bears.

The fact that a promulgated regulation differs from the regulation proposed in the notice-and-comment rulemaking process does not necessarily deprive the agency of the deference accorded to the promulgated regulation.  Manufactured Housing Institute v. EPA, 467 F.3d 391, 400 (4th Cir. 2006) ("MHI v. EPA"); see Int'l Harvester Co. v. Ruckelshaus, 478 F.2d 615, 632 (D.C. Cir. 1973) ("The requirement of submission of a proposed rule for comment does not automatically generate a new opportunity for comment merely because the rule promulgated by the agency differs from the rule it proposed, partly at least in response to submissions.").  An agency's final regulation will receive notice-and-comment deference as long as the final regulation is a "'logical outgrowth of the notice and comment[s]' . . . and not . . . a situation where the final rule 'reaches a conclusion exactly opposite to that proposed.' "  MHI v. EPA at 400 (citing Chocolate Mfrs. Ass'n of the United States v. Block, 755 F.2d 1098, 1103 & 1105 (4th Cir. 1985)).

Because the only big game in the Commonwealth of Virginia are white-tailed deer and the American black bear, adding bears to the final rule does not make it defective because it is the logical outgrowth of "Big Game Hunting."  Further, any allegation that the FWS did not go through proper notice-and-comment in 1998 as required by the APA is **MOOT** in light of the extensive notice-and-comment engaged in by the FWS prior to issuing the bear hunt regulations in October 2006.

[4]"Comprehensive Conservation Plans provide long-term guidance for management decisions and set forth goals, objectives, and strategies needed to accomplish refuge purposes and identify the Service's best estimates of future needs." Doc. 3, Ex. 2 at Unnumbered p. 2.

different scoping meetings,[5] at which members of the public provided the FWS with comments on how they would like the Refuge to be managed and what activities they would like permitted on the GDSNWR.  Following the scoping meetings, these public comments were categorized to determine the focus of public concern.  The FWS also met with a variety of other stakeholders, including state agencies and non-profit organizations, who provided the FWS with additional scoping information that the FWS considered before evaluating the proposed options and drafting the CCP/EA.

In March 2006, the FWS released the Draft CCP/EA, which included an outline of rationales, objectives, and strategies for black bear management, habitat protection and restoration, and hunting opportunities.  Doc. 3, Ex. 1 at 91-92, 114-16, 119-22.  Following publication of the Draft CCP/EA, the FWS provided a 41-day period for public comment, between March 13 and April 26, 2006.  This public comment period was initiated by a Federal Register notice as to the availability of the Draft CCP/EA and the subjects it entailed, including the bear hunt.  The FWS also issued press releases to over forty (40) media outlets regarding the availability of the Plan and scheduled public meetings where further public comment would be taken.  Three (3) meetings, in addition to the four (4) previous scoping meetings, were held in March 2006.  The black bear hunt was discussed at these meetings and staff from the FWS was available to take comments and answer any questions.  Written comments were also received

---

[5]A scoping meeting operates much like a town hall meeting.  It is open to the public and begins with an overview of the current refuge strategies and those activities presently allowed on the refuge.  The public is then invited to come forward and give their input as to any changes they would like to see in the management of the refuge.

during this time period, of which eight (8) regarded bear hunting in the GDSNWR.  The written comments included arguments both for and against bear hunting.[6]

The Final CCP/EA was published in July 2006.  Doc. 3, Ex. 2.  The Plan includes the provisions regarding rationale, objective, and strategy for the revised programs, as stated above, as well as the Compatibility Determination for the Black Bear Hunt ("Compatibility Determination").  See id. at 91-99, 229-32 (the record is not clear as to whether this Compatibility Determination was also included with the Draft CCP/EA).  The Compatibility Determination explains the purpose of the GDSNWR, that public hunting of black bears is a "priority use," how, when, and why the use will be conducted, the anticipated impact of this use, as well as what stipulations are necessary to ensure that the use is compatible with the mission of the National Wildlife Refuge System.  Id. at 229-31.

The Final CCP/EA is prefaced by a Finding of No Significant Impact ("FONSI"), which is required where, following the completion of a CCP/EA, the FWS determines that the changes entailed "will not have a significant impact on the quality of the human environment in accordance with Section 102(2)(c) of the National Environmental Policy Act."  See id. at iii-iv.  A FONSI must be issued when the FWS declines to issue an Environmental Impact Statement ("EIS").  See id.; 40 C.F.R. § 1501.4.

The Final CCP/EA also addresses public comments that were submitted during the comment period.  Id. at 186, 190-91.  The agency took pains to address two specific concerns about the bear hunt.  Id.  The first comment suggested that more research needed to be done to

---

[6]The Virginia Department of Game and Inland Fisheries and North Carolina Wildlife Resources Commission both submitted letters in support of the black bear hunt, in addition to letters from individuals who supported the opportunity to hunt bears in the GDSNWR.

understand the dispersal and movement of the bears.  Id. at 186.  The FWS agreed that "more knowledge is needed on the overall demography and ecology of the 'Dismal Swamp' black bear population before any large scale management for this species can occur."  Id.  The second comment questioned the accuracy of the perceived natural effect of the bear hunt.  Id. at 190.  The FWS responded by reciting the two (2) studies that were relied upon, the studies' conclusions, and the considerations the FWS took into account to ensure minimal impact on the bear population, such as scheduling the hunt for a date when pregnant female bears would be in their dens.  See id. at 190-91.  The record contained numerous letters, including letters from State wildlife organizations, in support of the bear hunt.  See supra n.6.

In October 2006, the FWS issued the 2006 Refuge Black Bear Regulations ("Bear Regulations"), officially permitting the hunting of black bears in the GDSNWR.  Doc. 3, Ex. 5. These regulations provide that American black bear hunting season in the GDSNWR will be open on December 1 and 2, 2006.  Id. at 1.  The number of bears which may be killed, or "harvested," is limited to twenty (20) over the course of two (2) days.  Id.; Hearing Ex. 2 (safeguards established for the bear hunt).  The Bear Regulations also place restrictions on permits, scouting, weapons and ammunition, attire, and safety precautions.  Id. at 1-3.  Though the number of hunters is limited to one hundred (100), a total of only fifty-eight (58) individuals had been issued permits pursuant to these restrictions by the date of this hearing.  Hearing Ex. 2.  The hunt will be the first recreational bear hunt ever conducted in the GDSNWR.  Doc. 3 at 2.

Plaintiffs are two Virginia residents, two foreign non-profit corporations, and one domestic charitable trust.  Doc. 1 ¶¶ 2, 4, 7, 10, 15.  On November 30, 2006, Plaintiffs filed a Complaint (Doc. 1), Motion for Temporary Restraining Order and Preliminary Injunction (Doc.

2), and Memorandum of Law in Support of their Motion (Doc. 3) (the latter two documents shall hereinafter be collectively referred to as "the Motion").  Plaintiffs claim that the scheduled black bear hunt "must be halted . . . because (1) the FWS has never officially or lawfully opened the GDSNWR to bear hunting [in the 1998 regulation it adopted] and (2) the FWS has failed to comply with its own regulations and procedures and with the National Environmental Policy Act ('NEPA') when it authorized the recreational harvesting of black bears in the GDSNWR [in 2006]."  Doc. 1 ¶ 1.

## II. STANDARD OF REVIEW

"The standard for granting either a TRO or a preliminary injunction is the same."  U.S. ex rel. $12,642.00 U.S. Currency v. Com. of Va., 2003 WL 23710710, *1 (E.D. Va. 2003) (Not reported) (citing Rum Creek Coal Sales, Inc. v. Caperton, 926 F.2d 353 (4th Cir.1991); Railway Labor Executives v. Wheeling Acquisition Corp., 736 F. Supp. 1397 (E.D. Va.1990)).  To obtain a preliminary injunction the traditional standard requires the court to evaluate four factors: (1) the likelihood of irreparable harm to the plaintiff if the preliminary injunction is denied; (2) the likelihood of harm to the defendant if the requested relief is granted; (3) the likelihood that the plaintiff will succeed on the merits; and (4) the public interest.  Manning v. Hunt, 119 F.3d 254, 263 (4th Cir. 1997) (quoting Direx Israel, Ltd. v. Breakthrough Medical Corp., 952 F.2d 802, 812 (4th Cir. 1991)).  The plaintiff bears the burden of establishing that the court should grant a preliminary injunction or temporary restraining order.  Id. (quoting Hughes Network Systems, Inc. v. Interdigital Comm. Corp., 17 F.3d 691, 693 (4th Cir. 1994)).

The United States Court of Appeals for the Fourth Circuit follows the "balance of hardship" test.  Blackwelder Furniture Co. of Statesville, Inc. v. Seilig Manu. Co., Inc., 550 F.2d

189, 195 (4th Cir. 1977); <u>see also</u> <u>Manning</u>, 119 F.3d at 263.  Under this analysis, the court must first "balance the 'likelihood' of irreparable harm to the plaintiff against the 'likelihood' of harm to the defendant." <u>Id.</u> "The harm demonstrated by the plaintiff must be 'neither remote nor speculative, but actual and imminent.'" <u>Manning</u>, 119 F.3d at 263 (internal quotations omitted). If the hardship balances in favor of the plaintiff, then the likelihood of success of the claim is displaced and the plaintiff must only show that questions raised concerning the merits are "so serious, substantial, difficult and doubtful, as to make them fair ground for litigation and thus for more deliberate investigation." <u>Blackwelder</u>, 550 F.2d at 195.  However, the importance of the merits of the case increase as the "probability of irreparable injury diminishes." <u>Id.</u> "Thus, the balancing of hardships must be made before reaching the question of likelihood of success on the merits, because until that balance of harm has been made, the district judge cannot know how strong and substantial must be the plaintiff's showing of likelihood of success." <u>Manning</u>, 119 F.3d at 263-64 (internal quotations and citation omitted).  "Once this analysis is completed, the district court is [then] in the proper position to make a final determination of whether a preliminary injunction should be entered." <u>Id.</u> at 264.

### III. Discussion

Plaintiffs offered evidence in the form of affidavits to show that they, and their members, would suffer irreparable harm because they use the GDSNWR and enjoy the possibility of viewing the bears that reside there.  Doc. 1, Exs. 1-6.  Therefore, Plaintiffs state that by killing twenty (20) bears their ability to enjoy this public space would be irreparably and permanently affected.  Doc. 1.  Unfortunately, however, Plaintiffs have not shown that the harm they would suffer is "neither remote nor speculative, but actual and imminent." <u>Direx Israel</u>, 952 F.2d at

812.  Specifically, only the two individual Plaintiffs have actually visited the GDSNWR, and neither has ever seen a black bear.  Doc. 1, Exs. 1 ¶ 5, 2 ¶ 5.  Their allegations are therefore merely remote and speculative, as they cannot show that the bear hunt will change their visits to the GDSNWR in any tangible way.

Elliot M. Katz, President of Plaintiff In Defense of Animals ("IDA"), further states that the bear hunt would increase the likelihood that IDA's members, whom Mr. Katz speculates visit the GDSNWR, "will see dead, wounded, or dying bears during their visits, and because they fear for their personal safety and the safety of their children in areas where hunting with firearms is taking place."  Doc. 1, Ex. 3 ¶ 8.  However, Defendants submitted evidence showing that the hunt would take place in a remote 20% of the GDSNWR which would be closed to other individuals using the Refuge; therefore, a member of IDA, or any other organization party to this matter, visiting the GDSNWR during the bear hunt would not be exposed to the circumstances of the hunt, such as stray bullets.  See Hearing Ex. 2.

Finally, Plaintiffs' claims that they were harmed when the public was not given sufficient opportunity to comment are without merit in light of the extensive public comment conducted by the FWS in March and April of this year.  The Court **FOUND**, based on the evidence before it, that Plaintiffs failed to demonstrate that they will suffer any irreparable harm as a result of allowing the hunt to go forward.  Indeed, they presented no evidence that any harm will be suffered on their part, except to the extent they claim the killing of any bear causes them irreparable harm.

The Government, on the other hand, offered extensive evidence, including the testimony of the GDSNWR manager and two wildlife experts, to show that not only had the FWS engaged

in thorough research and planning to ensure the safety of any bear hunt conducted in the

GDSNWR, but that the hunt would have a nominal impact on the bear population, if any.  The

expert witnesses testified at length regarding their experience in managing bear populations.  The

manager addressed the allegations that the FWS had not conformed to the proper rulemaking

procedures required by the APA, and answered allegations regarding the depth of the research

and reports relied upon by the FWS.  The manager also testified to the efforts of the FWS to

solicit public comment on the proposed bear hunt and the amount and content of the public input

received.

The Government has shown that the amount of time and effort expended to ensure that the

bear hunt would be compatible with FWS's mission was significant, and that any further

investigation is not warranted.  The Government also showed that it adhered to the proper

procedures in allowing the hunt, and proffered scientific evidence tending to show that the

Plaintiffs' claims of damage to the bear population are groundless.  Accordingly, the Court

**FOUND** that Plaintiffs would suffer no irreparable harm should the hunt be permitted to go

forward.  Plaintiffs, therefore, must meet a more substantial burden in showing the likelihood of

success on the merits.  See Direx Israel, 952 F.2d at 812.

Plaintiff cannot show a likelihood of success on the merits.  Defendants' manager and

expert biologists specifically addressed the merits of Plaintiffs' two claims.  On Plaintiffs' first

claim that the FWS had not engaged in proper notice and comment under the APA, the manager

Suzanne Baird, Project Leader of the GDSNWR, stated her understanding of the rulemaking

procedure, and that the FWS had complied with this procedure.  She supported her argument

with specific reference to the Code of Federal Regulations, the APA, and the FWS regulations.

With regard to Plaintiffs' second claim, the expert biologists each testified to the extensiveness of the Defendants' research and consideration of public comment, as well as the nominal effect such a hunting plan would have on the bear population.  In light of the absence of authority or evidence presented by Plaintiffs on either claim, the Court **FOUND** that Plaintiffs did not show a likelihood of success on the merits.  The Government showed, through their argument and evidence, that the regulations and reports upon which Plaintiffs relied do not undermine the propriety of the process engaged in by the Defendants to initiate the bear hunt program in the GDSNWR.

Finally, the Court **FOUND** that the evidence on harm to Defendants and the public interest, prongs two (2) and four (4) of the "balance of hardship" test, did not preponderate in favor of either party.

## IV. CONCLUSION

For the reasons stated herein, Plaintiffs' Motion for Temporary Restraining Order is **DENIED**.  Following the Court's ruling from the bench but before the issuance of this written Opinion, the Plaintiffs exercised their option to dismiss this action without prejudice pursuant to Rule 41(a)(1)(i) of the Federal Rules of Civil Procedure.  Doc. 8.

The Clerk is **REQUESTED** to mail a copy of this Opinion & Order to all counsel of record.

It is so **ORDERED**.

_____
                                   /s/
                          HENRY COKE MORGAN, JR.
                     SENIOR UNITED STATES DISTRICT JUDGE

_____

Norfolk, Virginia
December 11, 2006